I may have pleased the court. The fundamental error in this case, candidly, was that the district court and the plaintiffs, for some reason, allowed causation to completely fall out of the case. It is Hornbook contract law that in order to demonstrate a breach of contract, you have to have a duty, a breach of that duty, and that the breach has to cause harm or injury. Causation is a central element of it. The jury was never instructed to find causation. And frankly, the plaintiffs don't really argue anything about causation. Their view of the world is, we didn't get the benefit of the bargain, and therefore, there's been a breach of contract. And therefore, we're entitled to go forward without having to pay under this agreement. But the reality is, that's not how you get a breach of contract. You have to demonstrate that but for liquidated damages provision or the shortfall fee provision in this case, that Drummond Coal would have satisfied the shortfall fees and would have, in fact, shipped coal. But what we know to be true, and the only decision maker in this case who's analyzed the question properly was Judge Urbanski at the rescission stage when he said, plainly, factors other than the liquidated damages provisions in Norfolk Southern's utility contracts caused Drummond not to meet the minimum volume of requirements in C9337. And it is, candidly, that finding that should be the death knell of the breach of contract claim, just as it was the death knell, along with, frankly, other criteria for the rescission claim in this particular case. And so, therefore, the jury, not having been asked to make a finding on causation, the fact that there is no evidence of causation means that this court should reverse. Now, you say, is there no evidence of causation? The answer is quite clear. First of all, we know there is no evidence in this record from any of the utilities asking them why they didn't purchase Drummond Coal. I don't think that's an accident. Counsel, if I could ask a question. It seems like before you get to whether or not there is evidence or not of causation, the first question is what the first count sought. And I'm not sure the first count at least sought a determination for liability under a breach of contract claim, and, indeed, they don't have a cause of action for breach of contract. It seems like, at least count ones, a DJ that your client has breached an agreement, which is part of a breach of contract case, maybe part that would suffice for a defense if you were to enforce, seek to enforce the contract. So I guess my question is, assume they just want to show a prior breach and not all the elements in order to recover money from you or recover some other relief from you, but just establish a prior breach. Number one, is there anything wrong with that? And number two, if that's the case, why would they need to show causation? Well, there's nothing wrong with asking for a declaration, I suppose, of almost anything you want to ask for a declaration of. But at the end of the day, if you want legal consequences to flow from the declaration, then you have to get a declaration that satisfies all of the elements of a breach of contract. You can't just say that we could have behaved better or we could have performed more under a contract than we are required to and say, under those circumstances, what consequences flow. Ultimately, it is Hornbrook law. In order to make the contract breach actionable in any way, it has to have caused some harm. And that's what's missing in this case, is there is no harm. Why? Because there was never any effort by Drummond to sell coal in this market. Let me just get one more thing, and I appreciate your answer, but hypothetically, if you had sued Drummond for breach of contract and they said as an affirmative defense, no, you breached the contract first. Is it your position that in order to offer up that defense, they have to prove all the elements of a breach of contract claim? Or is it sufficient that they just show you breached the contract first? No, I think, well, breach the contract, of course, assumes in some ways the answer to the question, because breach it in what way? Is it a breach that carries consequences to it? The example from, I wish I could remember the case, but the Virginia Supreme Court decision where there was a foreclosure and that was followed by a claim by the property owner that the foreclosing company had not satisfied all of the procedural elements before engaging in foreclosure and therefore said there was a prior breach and therefore you can't enforce the underlying foreclosure sale. And the court said, well, but if they satisfied all of those requirements, would it have made a difference? And the answer was no, because they couldn't cure under those circumstances. That's exactly the same situation here. You can't just simply say we should have behaved differently than we did when at the end of of Drummond's behavior. Drummond had a policy of selling its Colombian coal to the European market and to the Alabama market. It generated $11 billion in revenue. It was perfectly reasonable to pay a relatively small amount for this option, as Judge Urbanski found ultimately, and the option was always available there. And so at the end of the day, it is their responsibility, given that they brought the breach of contract claim to demonstrate that there is in fact harm caused by our conduct. And again, to go back to what I was saying previously, first, they have a policy of not selling through Charleston to, you know, they made very few bids. The only evidence of any of the bids in terms of the in terms of the economics of it from their expert was wrong. And the only conclusion you could draw is that the price of their coal was significantly higher than the alternative prices of coal that were- Counsel? Yes, Judge Harris. So is your, I mean, I understand your argument, but it just seems that the jury disagreed with you. And so is your position that the jury instructions were wrong and they allowed the jury to fine a breach of contract? Without finding causation. Or is your position that the jury got it, was properly instructed, but came to a conclusion that no reasonable jury could come to? Our position is they were improperly instructed. Had they been properly instructed, they could not have reached the verdict. And you objected to the instructions? We did object to the instructions. You objected? Yes. And you asked that they be instructed how? On causation. But I thought that was in connection with your prevention claim. And they were instructed that under prevention, they had to, the coal company would have to establish that the prevention caused it not to perform. You're saying you were asking for a different causation instruction in addition to that? Yes. We asked for a very basic, fundamental causation instruction as to breach of contract. I mean, it comes out of the out of the foreign book breach of contract language, which is you have to have a duty. It has to be breached and it has to cause consequential harm or injury. And then in order to show consequential harm or injury, it has to be that the breach of contract was the proximate cause. That was the instruction that we sought. And candidly, that's the law. It should have been applied. If it had been applied, there's no reasonable jury that could reach the conclusion that it did under these circumstances where there is no effort to sell coal into that particular market. There was no impediment whatsoever. Not because, you know, could it have been an issue? Maybe, but it wasn't. So I think that from this court's perspective, the easiest way to reverse is to simply recognize that there is no breach of contract because there hasn't been any showing of causation. I'm happy to address the issues with respect to the duty of good faith and the actions that we took and whether there is a breach of contract to begin with, because I don't know. Candidly, there wasn't. But in my own judgment, the stronger argument at this point is the causation argument. And I would urge the court to reverse on that basis. And obviously there's a whole rescission argument, but if I could, I'd reserve some of my time to be in a position to respond to my colleague's argument on that point. If there are no other questions. Oh, I've got questions. So you do not want us to, you're not, you're not here to argue about the statute of limitations today. That's waived. Well, I think the statute, I mean, first of all, I think clearly when you make a finding on July 1st that 2010 is the date in which the contract was breached, particularly as it's conceptualized by the plaintiffs, that you have to file within five years of that date. I mean, part of the problem is if you eliminate all of the causation element of the case, then their basic theory of what was the benefit of the bargain was this unfettered right to have a rate that they could bring forth to the utilities. And that unfettered right was breached or lost on July 1st, 2010, and they filed suit five years later. So clearly that was the, that's outside of the statute of limitations. Well, it can't be that clear. If it were that clear, wouldn't you have raised it in your answer? Well, it wasn't the answer. We raised it in the, in Justin Richmond component of the case to be sure, but it was in the context of, should you be able to get, you know, money back from us, which is ultimately the theory that they tried to use under, under the combination of counts one and six. But there's no question that they knew that we thought that the statute of limitations had run. We also raised it at the end of the trial and the other side, we raised it at that point. And so it was in the case and, and clearly, and they were the ones who asked for the jury finding on July 1st and they got what they asked for. Unfortunately, the consequence of that is given their conceptualization of the case, everything they wanted, they lost on July 1st, which means they should have brought the lawsuit much sooner than that. So your position is it wasn't waived because you raised it in the answer in connection with a different claim. Okay. Do we have any cases saying that? Right. A different claim in the same, but, but to the same basic problem, which is the claim that's asking us to give up money, which is what we were saying is you can't ask us to give back money unless you act sooner than that. And you didn't do that. And so that's why it's beyond the statute of limitations. But counsel, I mean, maybe I'm, maybe I'm missing that. I mean, statute of limitations is a pretty straightforward concept and it says that in the rules of civil procedure, that's affirmative defense, or are you saying that if you just use similar words in a related concept that I'm at, maybe that's the argument I'm having trouble with that one. Just given the specificity of the rules, well, there's no question. We asserted statute of limitations in those terms. What we did say was as to count two, as opposed to saying it as to count one and to count six, if those are manipulated. But the reality is, is that count two was the one in which we were being asked to actually disgorge funds. And so it makes sense that in that context, we would have been specifically concerned about the timing of all of this. But the reality is, is it would put an issue, the question of whether they had brought the suit in a timely fashion. And the answer is under their own, under the findings of their own jury, they didn't act within the time that was, that was appropriate. And I think it's important in that context to recognize there's only really an issue because of the strange way they conceptualize the breach of contract argument. Judge Harris, again, it's not that we didn't have an opportunity to sell coal. We had no interest in selling coal whatsoever in that market. It's just that we wanted to have this completely unfettered ability to exercise that right if at some point we wanted to use it. And by cutting off at least to some markets that easy access, I suppose, that that's the breach that requires not only not going, not paying forward, but also rescission backwards. And the reality is, is that problem, that injury, if that were the injury, that injury was caused when they entered into the agreement with due power. And therefore, it's a complete answer to them to say that they should have brought the suit within five years. And having failed to do so, they're barred. As I say, I think the easier answer to the question posed to the court today is causation. Well, I guess before, before we move on, I do want to give you just a chance to address, I guess what I might phrase as my overall concern about the case and your argument. So, you know, we start with the jury finding that Norfolk Southern first bargained for these shortfall fees and then turned around and actively worked to prevent Drummond from getting any use out of what it had bargained for. And then the jury finds that that was a breach of Article 13 of the contract. And so, and you're not, I guess you're not arguing about the first finding. We can all agree that Norfolk Southern did this, that it bargained for these fees and then it turned around and actively worked to prevent Drummond from getting what it bargained for. And whether or not it succeeded, you know, I guess is a different question, but that's what it did. And then the jury also found that that was a breach. And I understand you think they weren't properly instructed on the breach, but if I think there was evidence in the record from which a jury could find that that caused, even assuming that they have to show the injury in this declaratory judgment posture, if I think there's evidence in the record, whether it's that strong or not, from which a jury could find, yeah, they breached the contract and it cost them something. Where does that leave me? Judge Gregory, may I answer the question? Yes. Thank you, Your Honor. Well, I think if you find, in fact, that there is adequate evidence to make a finding of obviously statute of limitations that's still available, and obviously even in that circumstance rescission wouldn't be available, but I would take, obviously, issue with the assumption there that there is any evidence from which one could derive any notion that they had any intention ever during the time of this contract of ever selling coal under these circumstances. Okay. If, candidly, it's worth at least making one last point about this because it goes to the It is true that we entered into other contracts, and you can say that that means we actively participated in some sense, but the reality is . . . Well, I'm not saying it. The jury said it. The jury said it after a long trial. No, I understand, and I'm not fighting what the jury actually says in its instructions, but what I am saying is the notion that somehow Norfolk Southern would have gone into this arrangement with the intention of undermining this and that what they really wanted were these shortfall fees is commercially absurd because this was a contract that was going to generate for Norfolk Southern hundreds of millions of dollars in revenue. They had every interest in the world in having this coal shipped under the terms of this contract. They would have made much, much more money under those circumstances, and frankly, that's how you end up in a world like we are today, and it's why causation is such an extraordinarily important element of this case is because what we did, whether it was good, bad, or indifferent, ultimately didn't make any difference to what Drummond did, and therefore, they are not entitled to . . . they are not entitled to get out from under the burden of this contract, and we certainly do not owe them anything in rescission. If there are no further questions, I would like to reserve the time for rebuttal, Your Honor. Thank you, Mr. Kulop. So reserved. Thank you, Your Honor. Mr. Ross. I'm sorry. Mr. Wells. Thank you, Your Honor. May it please the Court. My name is Trey Wells. It's Stars, Davis, Glory in Birmingham, Alabama, and I'm here to represent Drummond Coal Sales Inc. I think that the context of this contract is very important because there is nothing in this industry like it or any industry like it. In the history of coal shipping, the utilities have always had the shipping contracts. The coal suppliers are essentially bidding in the dark. The contracts are confidential. So the utilities ultimately buy the coal on a delivered price. They're going to pay the shipping. They're going to pay the coal price. Suppliers like Drummond only know one of those components. The shipping component has always been hidden, and frankly, the shipping component is huge. It can exceed the coal price itself, which is odd in any sort of shipping arrangement, and the reason that is, is railroads like Norfolk Southern have outsized control over these utilities. If you look through the 23 destinations that we have in the contract, most of them, Norfolk Southern is their only option. They have the only tracks running in and out. So they've got a lot of bargaining power to get their rates really as high as they want them to be. Now, this contract was supposed to, for the first time in history, change all of that. Drummond negotiated a contract where for the first time, we would know the shipping cost of our coal to these 23 specific destinations, and that was very important to us, and it was so important to us that we gave up millions of dollars of consideration for that right, for that option, as Mr. Phillips said. We gave up... Council, if I could interrupt you, I'd like to just make sure I'm understanding the claims because the claims, at least that survive some re-judgment, to me, it's important to understand kind of what you're seeking in those claims, and first of all, with respect to the first count, are you seeking a declaration of a breach of contract cause of action with all the elements, or are you seeking a declaration for certain elements of a breach of contract? Namely, that there's been a breach by Norfolk Southern. Thank you, Judge Quattlebaum. You were right in your original question. We were asserting it as a defense. Norfolk Southern made clear in the district court, if we had not filed first seeking declaratory judgment in asserting various defenses, they were going to sue us because we had not paid the most recent score of all fees. So count one is essentially to set up a defense if they try to recover under breach of contract for you, and under that situation, if someone's asserting the prior breach defense to a breach of contract case, do they or do they not have to establish all the elements of a breach of contract cause of action, or do they just have to establish that there was a material breach? And if you'd answer that with authority, that would be great. Yes, Your Honor. The case law in terms of the defense speaks in terms of a material breach. The Bayer-Crompsci case that we cited in our papers actually addresses that argument. There was a, the opposing party was arguing, well, look, they can't set up this first material breach defense because they can't show any damages were caused by this breach. And the Bayer-Crompsci case expressly rejected that proposition, said Virginia law does not require a party to prove damages in order to successfully invoke the first material breach defense. So, the issue of material breach was presented to the jury, and frankly, the statement here that the jury was improperly instructed is the first time I've seen that argued in this appeal. I did not see that in any of the briefings. That, in my opinion, is way, it can't be raised for the first time in a reply, I'm sure it can't be raised for the first time during oral argument. There is nothing in their brief about the jury being improperly instructed, and the instructions found that there was a material breach, such that we did not receive the benefit of the bargain, which the case law clearly states, if that is proven, then you have a defense to future performance. So, the, what we were buying here was the ability to use our own rates. There was a lot of argument about, well, you could have shipped under utility rates, too. That is not a consideration to us. We always had that option. We always had the ability to ship under the utility rates. We had always been doing that throughout history. Until now, we paid all this money to get the option to use our own rates. And then six months after we entered that contract, Norfolk Southern enters into a contract with five of our 23 destinations, saying it will be a breach of your contract if you use Drummond's rates. They impose liquidated damages if our rates were ever used. And we gave the example in our papers of the Allen Station. That's one of the power plants in the Duke contract, one of our 23 destinations. Our rate was supposed to be $19.50. So, when we're trying to analyze pricing, we look at, all right, we know the fishing costs. We're trying to find a fair price for our coals so that the deliver price will be competitive. Unbeknownst to us, the shipping cost was actually $25.00. But the contract that we were supposed to use with Duke required them to use their own contract and their own rates. And if they didn't, they had to pay liquidated damages amount of $6.00 per ton. And really, this case is odd in terms of timing. The only reason this is not a repudiation case is because Norfolk Southern did all this. If Norfolk Southern had come to us and just said, look, I know we promised you in your contract your rates at Allen Station was $19.50, but we're going to actually charge $25.50. If we had known that, we would have sued and said that was a repudiation immediately. That doesn't mean, that doesn't require a lost sale because no sale would have happened. We would have just sued under the contract and gotten out of it that way. The only reason we have five years of history beyond that time is because all these contracts were confidential. Norfolk Southern never told us what they were doing. Now, Norfolk Southern argues that there was no express breach here. Now, the Article 13, the jury disagreed with them on that. And the jury was properly instructed on that. So, there's evidence that they breached their promise of guaranteed rates to us. And the jury found in our favor. Let me, if I could stop you there. I mean, tell me the exact language of, I mean, to me, I understand your implied covenant of good faith argument. To be honest with you, I don't understand the exact language of Section 13 you say was breached. Article 13 states that the base rates for transportation of your coal will be as set forth in the schedule. And the schedule lists out all the 23 destinations and the rates. So, did they charge you a rate other than that? The rate that, the shipping cost that was actually charged was that plus what they were going to end up charging our customer, which at the end of the day, the customer is paying all of it at the same time anyway. So, the effect is the same. And it's, the express breach is we were promised one thing. We were given something else. Yeah, but you don't get, you don't, I mean, I'm sorry to interrupt you, but you don't get to just talk, I mean, again, I think, I don't, this may be academic because you have an implied covenant of good faith and fair dealing. But if your claim is Section 13 and that provision says if you ship under the contract the price will be this, it seems to me to breach that you'd have to say we shipped under the contract and they charged us a different rate. It seems like you're just saying they did something bad and lumping that under Section 13. Well, the way Judge Urbanski explained it in his summary judgment opinion and what is borne out in the case law is that what is necessarily implied in the contract is enforced as if it's expressed. And if Norfolk Southern tried to make that an implied duty of good faith argument, that is not the law. That, for example, if you and I negotiate for an option for me to purchase your car and I find out you took the engine and sold it to somebody else, well, there's nothing in the contract that says a car, you've got a car, but it doesn't have an engine. I think everybody can agree it's necessarily implied you're going to give me the car as I thought I was going to get it when we entered the contract. That's expressed in the Pelegrin v. Pelegrin, which is cited in the court's summary judgment opinion, what is necessarily implied is much part of the instruments that are plainly expressed and will be enforced as such. If I disagree with you and think you have evidence that supports the breach of implied covenant of good faith and fair dealing, but there's no evidence that would support breach of provision 13, do you still prevail under count one? Yes, your honor. The jury was asked the question, did Norfolk Southern's conduct breach the contract, whether expressly under article 13 or under the implied duty of good faith and fair dealing, and the jury's answer was simply yes. So if the jury's verdict can be upheld under any theory, then yes, if your honor does not agree with the express breach, but does agree with the implied duty of good faith and fair dealing, the jury's verdict can be upheld under either scenario. Mr. Wells, just very briefly, you were going through the scenario, but tell me, you mentioned that rather than utilities rates that you had access to before, you're trying to get from out of this not knowing what the shipping cost was. You say a couple of times we paid to have this new arrangement. How do you pay, do you suggest in terms of in that negotiation somehow Norfolk Southern got more money than it normally would out of this contract? Just briefly explain that. Okay, in the normal circumstance, we're shipping on the utilities contract. Right, I get that. So we don't have to give any consideration to Norfolk Southern. We literally just plug the price to the utility, they handle the shipping, and that's The consideration we gave up to get our own rates was a guarantee that we would either ship a certain amount or pay roughly $7 million a year, plus we had to pay about $10 million for infrastructure upgrades that Norfolk Southern still has to this day. Without our own rates, if we're just using utilities rates, we didn't have to give up any of that consideration. Well, that was the underpinning of the contract in the deal itself, right? That's correct, Your Honor. And that's why we think the pointing to the ability to use the utilities rates is somewhat of a misdirection because that is not the purpose of the contract. There's no consideration flowing to us by Norfolk Southern saying you can use the utilities rates and you give us money and guarantee us having the shipments. We don't have to do that. We've always been able to do that and all of our competitors were able to do that today. Thank you. You can proceed with your argument. I just want to, I thought that was correct. I just want to make sure. Go ahead. Thank you, Your Honor. And just to move on to the applied covenant of good faith, it's undisputed in this case that Norfolk Southern promised us usable rates, rates we could actually use with 23 specific customers. It is also undisputed that they penalized those customers if they ever used their rates. In fact, they've made it a violation of a legal duty, a violation of their contract to use our rates. The evidence also showed why they would be motivated to do this. Now, Mr. Phillips inaccurately stated Norfolk Southern would have made more money had we shipped. The evidence does not bear that out. If you look at the closing argument, we explained to the jury how to get to this calculation within trial exhibit 169C. We did actually ship some coal to these destinations in the early part of 2010. And the profit that Norfolk Southern made off of those shipments was less than the profit that they made off of just collecting liquidated damages from us. So, they had every incentive to not want us to ship under this contract and then end up making more money than they would have had they shipped. And not only did they make more money on the liquidated damages, they get paid two ways. They make more money from us on just free money, liquidated damages. But number two, they're shipping the coal anyway. They have the only rail in and out, so they get paid for those shipments. But the numbers, the revenues that Mr. Phillips was talking about, they're getting those revenues. Those coals are going in from our competitors, but they're also getting an extra boot on top from us of $7 million a year, which is pure profit. They don't have any costs involved in that. And the evidence also showed that they knew what they were doing was wrong. If I could just finish this one statement, Your Honor. After the lawsuit was filed and we started raising issues and calling them on this improper practice, they changed one of their contracts and for the very first time said, all right, in your contract, you can either use your rate or you can use Drummond's rates and it will count. We will not penalize you. So the jury had all of that evidence of not only improper conduct, motivation to engage in improper conduct, and also acknowledgement that it was improper. They had more than enough evidence to come to the conclusion that Norfolk Southern was acting in bad faith. Thank you, Mr. Wells. Thank you, Your Honors. Mr. Phillips. Thank you, Your Honors. Hopefully you can hear me. Yes. Great. Judge Qualbaum, let me answer the specific question you asked my friend on the other side, which is, can you have a declaratory judgment for something called a breach without actually demonstrating all of the elements of a breach of contract because it's in the declaratory judgment mode? In the case we cited on page 22 of our reply brief, Green versus Gable Gould, 597 Southeast 2nd 81. The Virginia Supreme Court said explicitly, no, if you're seeking declaratory relief, claiming a breach of contract, you still must assert and prove. But that begs the question, doesn't it? Are you seeking declaratory judgment kind of in lieu of a breach of contract, or are you seeking a declaration of a prior breach, which you can use as a defense if Norfolk Southern asserts breach of contract? As I understand the Green case, what it's saying is that in order to make a meaningful defense, you still have to show harm. It still has to be a demonstration of harm, whether you do it directly as a claim for breach of contract or whether you seek it as a matter of declaratory relief. It's still a black letter component of contract law that you have to show that there's been injury that flows from it. My friend didn't say anything about any injury that flowed from any of this. He talked about that they didn't have this unfettered ability to use the particular rates. But even in response to the specific question that you asked, Judge Qualamon, which was did they charge anything other than the base rates in this case, the answer to that question was no. We always charged the base rates. Was that the ultimate underlying economics of the deal? No, but of course there are a thousand variables that go into the economic underpinnings of the deal. What is absolutely clear, and I'm not going to get into rescission because my friend didn't raise anything with rescission on his cross-appeal, so I'm content to let that rest as matters stand. But at the end of the day, when you're talking about our failure to come forward, he claims that if we had told them that we were going to enter into these kinds of agreements, which candidly I think that they knew about anyway, but if we had told them that we were going to have these third-party contracts with these requirements, obligations imposed on them, they would have declared that to be a complete breach and gone forward. The truth is, this is where Article 27 is so critical, and I think it made a huge difference in Judge Urbanski's analysis. Article 27 is the one that says it's the obligation of Drummond. When they're having problems selling this coal into that market to come to us, and we will work in good faith to try to help them. They never invoked that provision. They never took advantage of what the contract specifically provides with respect to what to do when they're having difficulty selling. And why didn't they take advantage of that? It goes back to the basic point I've been making all along. They never had any intention throughout the entirety of this contract of selling coal in this particular market. Not because it wasn't a good option to have available, right? It was always the possibility that Europe would start to regulate coal more aggressively and make it, therefore, significantly less valuable. You couldn't use coal, and therefore, the European markets could be shut off. It's always possible that the U.S. domestic efforts might close down coal mines altogether, making imported coal from Colombia extraordinarily valuable. And they had this option. And that's the option, Chief Judge Gregory, that they paid for. That was specifically what they paid for, was to have the ability to come in if market conditions changed. Halfway into this agreement, I think they pretty much concluded market conditions were not going to change. And at that point, they started to look for an excuse to get out from under this agreement. Remember, this was originally brought as a force majeure action and then converted into a combination of breach and prevention and any other theory that they could throw against the wall. At the end of the day, it was their responsibility to prove that there was a cause of some harm to them. And they never proved that. And the only person who ever analyzed the question in terms of that causation element was Judge Urbanski. And he specifically said they never intended to sell coal in that market. And, therefore, there is no breach of contract. And, therefore, the court should- Counsel. Yes, Your Honor. So how much of this kind of injury argument turns on the failure to instruct the jury on it? And I guess, like your colleague, I am surprised to hear about this argument for the first time at oral argument. So, I mean, is your claim that the jury was misinstructed or not, really, because it's not in your brief? No, I mean, our claim is that the jury- I mean, I think there's no doubt the jury was misinstructed because the causation wasn't put into the case. But you don't want us to rule. Right. I mean, usually that's a big deal. Like if a jury is misinstructed before a five-day trial, and that's your argument, we would have- at least I would have expected to hear about it before today. Right. But that's if what you're seeking at the end of the day is a new trial with a properly instructed jury. That's not what we're seeking here. What we're saying is this jury was not instructed properly. There is no causation component to the case. The finding doesn't- so you cannot rely on the jury to create- as somehow having filled that void. And our view and our argument is, and it goes back to the question you said, if you can find any evidence of causation, would that be a basis for affirmation? The answer is yes, because we didn't ask for a new trial with a properly instructed jury. But I'll go back to what I answered you. There is not a shred of evidence of causation because it was the plaintiff's theory all along that they never had to prove anything with respect to harm. And at the end of the day, they did. And that's why judgment as a matter of law should have been entered in Norfolk Southern's favor, Your Honor. If there are no further questions, I'll rest, Your Honor. Thank you. Thank you. Mr. Wells, you have some time. Thank you, Your Honors. The issue of injury, I think Norfolk Southern concedes you don't have to prove damages. I mean, they concede that because they have to because that's what the law says. But yet their whole argument of what we didn't prove was damages. They say we have to show a specific loss sale and be able to show essentially lost profits. That is not what the law states. Virginia law, Horton v. Horton case, it was a prior material breach case where the spouse, the wife, did not get a sign of power of attorney. There was zero damages proven as it related to that. But they still said that was a material breach. It was a material part of the contract, therefore prevented her from suing for breach of contract. The Schmidt case that we cited, we actually cited it in the section talking about implicit obligations of a contractor are just as much expressed as those that are in the words. But the case there was the first material breach case and the employer said, well, implicit in this contract was that the employee would accurately report as ours. And because he breached that, he can't now sue us for underpaying him. And this court found that that was a first material breach and the employer was excused. There is zero damage analysis in that case. In fact, I don't know how you could possibly even conceptualize the employer somehow being damaged monetarily in any respect by the employee failing to report all of his hours. The Mobile Oil case goes directly to this issue. And it's interesting because Norfolk Southern's counsel in this case actually wrote the briefs in the case. And we would recommend that the court, if it hasn't already, to review those briefs. But I think it explains the law in this area very, very well. The government in that case had a contract. Basically, the drilling companies had an option to try to explore drilling. And the government said, we'll do it under this certain regulatory scheme. The government then goes out and changes the regulatory scheme. And the oil companies sued for material breach, for repudiation, because it was in front of them. Had it been hidden, they would have gone backwards and sued for material breach. But the whole of the government's argument was, well, look, they were never going to be able to drill anyway. Because North Carolina objected to their drilling plan, it didn't matter what our regulatory scheme was, because they were never going to be able to drill. And really, that was not a disputed point in the case. They were never going to be able to drill for oil. And the government said, so they can't, whatever our regulatory scheme did, it didn't cause them to not be able to drill, and therefore, they can't sue. They can't get the money they paid for this option, because the option was never going to be successful. Well, the Supreme Court in Mobile Oil expressly rejected that argument. The court said what they fought was an opportunity to try to drill under this regulatory scheme that the parties agreed to in the contract. There's nothing in the contract that prevents the government from enacting new laws. The government can always enact new laws. But that doesn't mean that by doing so, that they can't be interfering with the contractual rights of their counterparty. And I thought the Supreme Court gave a very good example, which I think really undercuts Mr. Phillips' arguments, that if a lottery operator sells you a lottery ticket but doesn't deliver the ticket, you didn't get what you paid for, you should get your money back. It doesn't matter that you weren't going to actually win the lottery. I mean, the lottery operator can't come in and say, well, look, these are the numbers they picked, and it didn't win. So no harm, no foul. They paid for something. They paid for an opportunity which was not provided to them. Norfolk Southern, we paid for an opportunity to use our rates. And the jury found, and I don't even think it was disputed, that Norfolk Southern took away our ability to use the rates that were promised to us. Mr. Phillips talked about Judge Urbanski's findings after the jury's findings, talking about that Drummond chose not to sell, didn't really try to sell. Well, that was Norfolk Southern's entire theory in front of the jury. The jury was presented all of that evidence. The jury was presented competing evidence by us of significant efforts to try to sell coal into this market. We were bidding, I think it was $52 million, 52 million tons over the course of the contract. We were in constant negotiations. We were bidding coal at $4 million losses. In fact, it got to a point where we just started cutting off the $7 million penalties that we were getting and just cutting that off the coal price to see if we could get coal moving. The jury heard all of that evidence and rejected it, and we think that Judge Urbanski, in coming to a contrary conclusion, in rejecting restitutional decision, essentially giving us our money back, contravened the jury's verdict, which he has a lot of discretion in affording an equitable remedy, but a very serious limitation on that discretion is when there is a jury finding, he cannot contravene it, and we feel like he did in this case. Thank you, Mr. Wells. Thank you, Your Honor. Thank you, Mr. Phillips. You can't come down and greet you in our normal tradition of the Fourth Circuit. We appreciate your arguments and your help in this case. We hope that you both will be safe and stay well. Thank you so much. Thank you, Your Honor. Thanks very much.
judges: Roger L. Gregory, Pamela A. Harris, A. Marvin Quattlebaum Jr.